IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| FREDIS ANTONIO HERNANDEZ, *on behalf of himself and all similarly situated consumers*,<br><br>                    Plaintiff,<br><br>v.<br><br>DYCK-O'NEAL, INC.,<br><br>                    Defendant. | Civil Action No. 1:23-cv-1029 |

## VERIFIED COMPLAINT

Plaintiff Fredis Antonio Hernandez, on behalf of himself and all similarly situated consumers, by Counsel, files this Verified Complaint against Defendant Dyck-O'Neal, Inc. ("Dyck O'Neal"). In support of his Complaint, Mr. Hernandez alleges as follows:

### PRELIMINARY STATEMENT

1. Mr. Hernandez has owned his home since 2005 and lives there with his son, daughter-in-law, and his grandchildren. Even though he is current on his first mortgage, he is facing the imminent foreclosure of his home because Dyck O'Neal is attempting to collect his second mortgage, about which he has not received *any* correspondence since September 2009.

2. Now, Dyck O'Neal claims that Mr. Hernandez owes over $193,000 for a second mortgage that had an original balance of $79,000 even though it has never sent him a single monthly statement.

3. Through a non-judicial foreclosure, Dyck O'Neal is attempting to collect illegal interest, late fees and other default related charges even though it has never communicated with Mr. Hernandez, except to instruct its foreclosure law firm to send a foreclosure notice to Mr. Hernandez.

4. As a result, Mr. Hernandez is now facing imminent foreclosure scheduled for August 16, 2023, which will strip him of the significant equity that he has built in his home since he purchased it in 2005.

5. Accordingly, Mr. Hernandez alleges a class claim against Dyck O'Neal for making false and misleading representations about the amount of his second mortgage in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692e.

6. Mr. Hernandez also alleges individual claims against Dyck O'Neal for its violations of the FDCPA, 15 U.S.C. § 1692f, because it threatened to take nonjudicial action to effect dispossession of Mr. Hernandez's property when there was no present right to possession of the property. He also alleges a breach of contract because Dyck O'Neal has proceeded with the non-judicial foreclosure of his home even though it did not comply with the conditions precedent to the foreclosure in his Deed of Trust.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k. The Court has supplemental jurisdiction over Mr. Hernandez's state law claims under 28 U.S.C. § 1367.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## PARTIES

9. Mr. Hernandez is a natural person who lives in Stafford, Virginia. He is a consumer as defined by 15 U.S.C. § 1692a(3).

10. Dyck O'Neal is a Texas corporation with its principal place of business in Dallas, Texas. It is authorized to do business in Virginia through its registered offices in Henrico, Virginia.

Dyck O'Neal is a debt collector as defined by 15 U.S.C. § 1692a(6) because it uses interstate commerce in its business, the principal purpose of which is debt collection.

11. Upon information and belief, Dyck O'Neal's primary business is purchasing defaulted second mortgages on the secondary loan market for nominal amounts and then seeking to recover the full amounts from consumers through various means of debt collection, including the foreclosure sales of consumers' homes.

12. These mortgages often have been defaulted for years. Dyck O'Neal then seeks to collect amounts not permitted by law or the underlying loan contracts, including improper interest and late fees (including retroactively adding interest and fees waived by prior lenders and servicers), taking advantage of the fact that consumers likely do not have documentation regarding these old debts.

## FACTS

### *Zombie Second Mortgages*

13. This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages originated before the 2007–08 mortgage crisis.

14. Prior to the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages—without a down payment and without having to pay for mortgage insurance.

15. But second mortgages severely harmed consumers because of high interest rates and large balloon payments due at the end of the loan.

16. Consequently, during the Great Recession, many borrowers in 80/20 mortgage schemes were required to modify their first mortgages in order to remain in their homes, while their second mortgages were charged off.

3

17. Once charged off, consumers no longer received statements or heard anything about their second mortgages, sometimes for more than a decade, like Mr. Hernandez.

18. Because charge-offs typically happened around the time that consumers modified their first mortgages, many believed that the modification of their first mortgage also resolved their second mortgage—a belief that was perpetuated by the fact that consumers no longer received statements relating to their second mortgages.

19. Unbeknownst to many consumers, however, their second mortgages did not go away.

20. Instead, they were sold—often several times—to various debt buyers and subprime lenders.

21. Now, with the recent surge in housing prices, consumers have significant equity in their homes that make charged-off second mortgages highly profitable.

22. Debt buyers are now seeking to collect on defaulted second mortgages and, if consumers cannot pay, debt buyers are foreclosing on homes, selling the property, and taking the (often significant) equity to pay the outstanding loan—which they likely bought for pennies on the dollar.

23. This highly profitable scheme has surged in recent months, as home prices have increased and COVID foreclosure moratoriums have expired.

24. The debt buyers involved—like Dyck O'Neal—are using the foreclosure process to collect money that they are not entitled to, essentially stealing equity from consumers who survived the initial housing crisis of any remaining equity that they have since earned in their homes.

25. Even worse, these debt collectors are not collecting the amount due on the mortgages when they are charged off, as the law requires.

26. Under Truth-in-Lending-Act regulations, once a mortgage is charged off, the servicer is no longer required to send monthly statements, but it cannot assess any additional late fees or interest on the account. 12 C.F.R. § 1026.41(e)(6)(i).

27. Instead, the servicer may resume charging interest and fees on the account only if it resumes sending monthly statements, but it may not retroactively assess any fees or interest for the time during which statements were not sent. 12 C.F.R. § 1026.41(e)(6)(ii).

28. Yet services are retroactively assessing late fees and adding interest to the loans—amounts that were waived by the prior loan servicers—and are seeking to collect vastly inflated amounts from consumers.

29. In Mr. Hernandez's case, for example, his loan balance more than doubled because of improper fees and charges.

30. When debt collectors, like Dyck O'Neal, can foreclose on properties and collect these improper charges, it not only robs the consumers of their homes, but it also strips them of tens of thousands of dollars in equity—one of the primary ways that low-income and middle-class families can build wealth.

### *Mr. Hernandez's Zombie Second Mortgage*

31. Mr. Hernandez purchased his home in Stafford, Virginia in November 2005.

32. As was common at that time, Mr. Hernandez financed his house using two mortgages.[1]

---

[1] https://www.consumerfinance.gov/ask-cfpb/what-is-a-piggyback-second-mortgage-en-1955/ (last visited Aug. 2, 2023).

33. In August 2009, he began the process of applying for a loan modification on his first mortgage.

34. Mr. Hernandez last paid his second mortgage in September 2009, which is the last statement that he received from his servicer.

35. In July 2010, Mr. Hernandez's first mortgage was permanently modified under the HAMP program in effect at that time.

36. Because he stopped receiving monthly mortgage statements for his second mortgage in September 2009, he believed that the lack of statements was because either his HAMP modification resolved his second mortgage or other 2MP programs in effect at the time cancelled his second mortgage.

37. Had Mr. Hernandez received a monthly statement in the mail regarding his second mortgage, he would have paid it.

38. Mr. Hernandez did not hear anything about his second mortgage for nearly fifteen years.

39. Then, in June 2023, Mr. Hernandez received a letter from Tromberg Morris Poulin, PLLC stating that Dyck O'Neal had scheduled a foreclosure sale of his home on August 16, 2023, unless he paid $132,362.64 to reinstate his loan.

40. This notice stated that it was being made in accordance with Virginia Code § 55.1-321.

41. Yet the notice lacked certain information required by Virginia Code § 55.1-321, including the correct amount of principal, interest, costs, and fees due in arrears. It also stated that his last payment on the loan was August 1, 2009.

42. This was extremely confusing to Mr. Hernandez for several reasons.

43. First, he had never heard of Dyck O'Neal, which never notified him that it had acquired his loan.

44. Second, Mr. Hernandez did not understand how he could owe so much money on his second mortgage when he had not received monthly statements in more than a decade.

45. In fact, Mr. Hernandez originally thought that the letter was a scam.

46. Mr. Hernandez sent a letter to Dyck O'Neal on June 28, 2023 asking it to prove that it owned the second mortgage and explain why the balance was so high. It also asked for any correspondence or monthly statements it sent to Mr. Hernandez, including any default or acceleration notice.

47. Dyck O'Neal responded to Mr. Hernandez's letter on July 11, 2023. This letter did not provide a single document it ever sent to Mr. Hernandez. In addition, the letter stated that Mr. Hernandez owed $77,522.45 in principal and $116,107.47 in interest.

48. These representations were false. As explained above, Mr. Hernandez did not owe these interest charges because he was not being sent monthly statements. 12 C.F.R. § 1026.41(e)(6)(i).

49. Because no mortgage servicer had sent Mr. Hernandez any statements since September 2009, Dyck O'Neal was not permitted to seek any interest charges from him during that time, let alone more than $116,000 in interest.

50. And even though it never properly accelerated his loan, Dyck O'Neal is still seeking to conduct a non-judicial foreclosure sale of Mr. Hernandez's home.

51. The foreclosure sale is currently scheduled for August 16, 2023.

# COUNT ONE:
## VIOLATION OF FDCPA, 15 U.S.C. § 1692e
### (Class Claim)

52. Mr. Hernandez incorporates the preceding allegations.

53. Under Federal Rule of Civil Procedure 23, Mr. Hernandez brings this action for himself and on behalf of the following class):

> All consumers: (1) with a non-performing loan owned by Dyck O'Neal; (2) to whom Dyck O'Neal sent written correspondence in the one year predating the filing of the lawsuit; (3) that contained a demand for payment that included a late fee or interest assessed by Dyck O'Neal for time periods when the consumer did not receive monthly statements.

54. **Numerosity**. Fed. R. Civ. P 23(a)(1). Upon information and belief, Mr. Hernandez alleges that the class members are so numerous that joinder of all is impractical. Upon information and belief, Dyck O'Neal services thousands of non-performing loans and subjects all of them to the same procedures for the assessment of interest and late fees. The class members' names and addresses are identifiable through Dyck O'Neal's internal business records, and they may be notified of this litigation by published or mailed notice.

55. **Predominance of Common Questions of Law and Fact**. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Dyck O'Neal is a debt collector; (2) whether Dyck O'Neal violated § 1692e of the FDCPA by making false representations about Mr. Hernandez's and putative class members' debts; and (3) the appropriate amount of statutory damages.

56. **Typicality**. Fed. R. Civ. P. 23(a)(3). Mr. Hernandez's claims are typical of the claims of each putative class member. He is also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

57. **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Mr. Hernandez is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Mr. Hernandez has retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Mr. Hernandez and his counsel will fairly and adequately protect the putative class members' interests. Neither Mr. Hernandez nor his counsel have any interests that might cause them to not vigorously pursue this action.

58. **Superiority**. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Dyck O'Neal's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

59. Dyck O'Neal violated § 1692e of the FDCPA by using false, deceptive, and misleading representations in connection with the collection of Mr. Hernandez's and the putative class members' accounts.

60. For example, Dyck O'Neal falsely represented that Mr. Hernandez and the putative class members owed late fees and interest for the months that they were not sent monthly statements.

61. Dyck O'Neal's statements were false. Mr. Hernandez and the putative class members did not owe these late fees or interest because they were not sent monthly statements.

62. Mr. Hernandez and each putative class member suffered a concrete injury in fact because of Dyck O'Neal's misrepresentation including, for example, an adverse impact on debt-making decisions and emotional distress.

63. In addition, some class members suffered actual damages when they paid these improper fees to Dyck O'Neal.

64. Under 15 U.S.C. § 1692k, Mr. Hernandez seeks actual and statutory damages for himself and each putative class member and his reasonable attorneys' fees and costs. He also seeks actual damages for the class members in the amount of the improper fees that they paid to Dyck O'Neal.

**COUNT TWO:**
**Violation of FDCPA, 15 U.S.C. § 1692f**
**(Individual Claim)**

65. Mr. Hernandez incorporates the preceding allegations.

66. Dyck O'Neal violated 15 U.S.C. § 1692f(6) by attempting to foreclose on Mr. Hernandez's home when there was no present right to possession of the property.

67. For example, neither Dyck O'Neal nor its agents ever sent Mr. Hernandez a notice that complied with Va. Code § 55.1-321.

68. Therefore, there was no right to foreclose on Mr. Hernandez's home. Va. Code 55.1-321(A).

69. Dyck O'Neal also failed to send Mr. Hernandez a notice of default or proper acceleration notice as required as a condition precedent to foreclosure by his Deed of Trust.

70. Because Dyck O'Neal did not comply with the conditions precedent to foreclosure listed in Mr. Hernandez's Deed of Trust, there was no present right to possession of the property.

71. Despite these defects, Dyck O'Neal has scheduled a foreclosure sale of Mr. Hernandez's home for August 16, 2023 and has refused to cancel it.

72. Because of Dyck O'Neal's violations of 15 U.S.C. § 1692f(6), Mr. Hernandez suffered actual damages, including significant emotional distress.

73. Based on Dyck O'Neal's violation of § 1692f(6), Mr. Hernandez is entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

## COUNT THREE:
## BREACH OF CONTRACT
### (Individual Claim)

74. Mr. Hernandez incorporates the preceding allegations.

75. A Deed of Trust is construed under Virginia law as a contract.

76. Under Mr. Hernandez's Deed of Trust, Dyck O'Neal was required to provide Mr. Hernandez with a notice of default containing specific information about the default and how he could cure it as a precondition to foreclosure.

77. Dyck O'Neal never even attempted to comply with this requirement because it never sent him a proper acceleration notice or other notice of default.

78. Mr. Hernandez also never received an acceleration notice or other notice of default from any prior servicer of his second mortgage.

79. An appropriate notice of default is a condition precedent to acceleration and foreclosure. *Bayview Loan Servicing, LLC v. Simmons*, 275 Va. 114, 121 (2008) ("Because

Bayview did not comply with a condition precedent under the Deed of Trust . . . Bayview has not acquired the right to accelerate payment under the terms of the Deed of Trust.").

80. Dyck O'Neal breached the Deed of Trust and did not satisfy the preconditions to foreclosure due to its failure to identify the nature or any default.

81. Dyck O'Neal's breach of Deed of Trust has caused Mr. Hernandez to suffer actual damages, including the assessment of fees and costs that he does not owe.

82. Additionally, Dyck O'Neal has waived the right to enforce the Deed of Trust through nonjudicial foreclosure when it has materially breached this contract for over a decade to Plaintiff's detriment.

83. Mr. Hernandez seeks an award for his actual damages from Dyck O'Neal.

84. Additionally, or in the alternative, Mr. Hernandez requests that the Court enjoin Dyck O'Neal from enforcing the Deed of Trust, including the foreclosure sale presently scheduled for August 16, 2023 under Va. Code § 8.01-622.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Hernandez, on behalf of himself and the putative class members, moves for class certification and for statutory and actual damages, as well as his attorneys' fees and costs as pleaded above against Dyck O'Neal for the class claim, as well as actual and statutory damages, injunctive relief, and attorneys' fees and costs for his individual claims; for pre-judgment and post-judgment interest at the legal rate, and any other relief the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**FREDIS ANTONIO HERNANDEZ**

By: ____/s/ Kristi C. Kelly_____
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170

          Casey S. Nash, VSB #84261
          J. Patrick McNichol, VSB #92699
          Kelly Guzzo, PLC
          3925 Chain Bridge Road, Suite 202
          Fairfax, VA 22030
          (703) 424-7572 – Telephone
          (703) 591-0167 – Facsimile
          Email: kkelly@kellyguzzo.com
          Email: aguzzo@kellyguzzo.com
          Email: casey@kellyguzzo.com
          Email: pat@kellyguzzo.com
          *Counsel for Plaintiff*

## VERIFICATION OF COMPLAINT

I, Fredis Antonio Hernandez, declare:

1. I am the Plaintiff in the attached complaint.

2. My primary language is Spanish, so to confirm the accuracy of the allegations made in the complaint, I reviewed it line by line with a translator.

3. I verify that I have reviewed the attached complaint and that the allegations made in it are true and correct to the best of my knowledge, information, and belief.

4. I have personal knowledge of the facts set forth in this Verified Complaint, and if called upon to do so, I could and would competently testify thereto.

5. I declare under penalty of perjury that the foregoing information is true and correct.

Executed in Fairfax, Virginia on August 3, 2023.

_____
Fredis Antonio Hernandez